## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## OWENSBORO DIVISION

DONALD W. SANDERS, JR. &                                    PLAINTIFFS
EMILY SANDERS


   v.                                          No. 4:21-cv-98-BJB


DICK'S SPORTING GOODS, ET AL.                                DEFENDANTS

* * * * *

## OPINION & ORDER GRANTING SUMMARY JUDGMENT

Deer hunters sometimes climb trees to improve their visibility and reduce their detectability.[1]  Many use climbing-stick systems for that purpose.  To assemble the systems, hunters secure poles or sections of ladder (the "sticks") to a tree with straps that wrap around the trunk.  *See* Complaint (DN 1-2) ¶¶ 11–19.  Donald Sanders alleges that he fell from a tree and was seriously injured after a strap broke on a Primal Vantage climbing system he bought from Dick's Sporting Goods.  ¶ 20.  "DSG" sold the system (and others Sanders bought) under its "Field & Stream" label.  *See* Climbing System Instruction Manual (DN 36-4, Exhibit C-A).  Sanders sued DSG[2] in Kentucky state court for product manufacturing defects, negligence, and breach of warranty.  ¶¶ 29–33, 38–42.  Donald's wife, Emily Sanders, also brought a derivative claim against DSG for loss of consortium.  ¶ 27.[3]

---

[1] *See generally The Role of Tree Stands in Successful Deer Hunting*, SPORTSMAN'S GUIDE (Oct. 29, 2024), https://www.sportsmansguide.com/article/the-role-of-tree-stands-in-successful-deer-hunting-boosting-visibility-and-accuracy?id=3221.

[2] The complaint incorrectly lists Dick's Sporting Goods, Field & Stream, Inc., and Field & Stream as distinct Defendants.  Field & Stream is not a distinct legal entity but rather a trade name for a line of outdoor products sold by Dick's Sporting Goods.  Notice of Removal (DN 1) at 1.  So DSG appears to be the only legal entity properly named as a Defendant in this case.

[3] Mr. Sanders also initially sued for defective product design, failure to warn, and punitive damages, Complaint ¶¶ 31–32, 43–53, but he withdrew those claims in his response to the motion for summary judgment, DN 40 at 9.  Mrs. Sanders' claim, meanwhile, stems from a single paragraph in the initial complaint disconnected from any of the other claims.  Because that claim's success depends on the success of the husband's products-liability claims and doesn't affect the legal analysis below, for simplicity's sake this opinion treats Mr. Sanders as if he were the sole plaintiff and his three remaining claims the only ones leveled against

After removing to this Court and undertaking discovery, DSG has moved for summary judgment. None of its products could've caused Sanders' fall, it maintains, and none of Sanders' claims can succeed without causation. DSG Summary-Judgment Motion (DN 36-1) at 1–2. DSG doesn't dispute that a broken strap led to the fall; rather it argues that the strap broke because Sanders used it for an improper and unintended purpose—it undisputedly should not have been used with a climbing system. *Id*. at 2. DSG's principal argument, however, is that the strap was neither made nor sold by DSG.

Undisputed evidence indicates that the broken strap was tan. And company witnesses swear that the company's climbing systems never used tan straps. Debiak Affidavit (DN 36-4) ¶ 8. An expert in hunting products agrees that the strap would have never been packaged with the climbing system. Affidavit of George M. Saunders (DN 36-3) ¶ 4, 15. Sanders himself insists that he pulled a tan strap from a DSG package—but photos from the scene show a patchwork of at least three different kinds of straps, not a complete set fresh out of the box. Donald W. Sanders, Jr. Deposition (DN 36-6) at 83:3–84:15. And Sanders' own hunting buddies, who accompanied him during the trip when he fell, contradict his account that they swapped out tan straps for black ones after the fall. Rick Suiter Deposition (DN 42-1) at 52:25–56:16; Andrew Chapman Deposition (DN 42-2) at 15:23–19:14.

After more than two-and-a-half years of discovery, Sanders' limited and contradictory evidence—considered against the undisputed facts identified by DSG—wouldn't allow a reasonable jury to find that a DSG strap caused his fall. So summary judgment is appropriate: because "there is no genuine dispute as to any material fact," DSG "is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

## SUMMARY JUDGMENT

To avoid summary judgment, Sanders must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Kentucky Department of Transportation*, 53 F.3d 146, 150 (6th Cir. 1995). That "evidence" must be admissible and cannot rest upon mere allegations or denials. FED. R. CIV. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

### A. DSG has produced ample evidence that its straps didn't cause Sanders' fall.

Though the Complaint doesn't refer to it, the Kentucky Product Liability Act governs Sanders' three remaining claims. *See* Ky. Rev. Stat. § 411.300 *et seq*. The KPLA applies to all Kentucky suits "founded on strict liability in tort, negligence or

---

DSG. *See Monak v. Ford Motor Co.*, 95 F. App'x 758, 768 (6th Cir. 2004) ("A claim for loss of consortium is a derivative action that does not exist absent a primary claim.").

breach of warranty." *Monsanto Co. v. Reed*, 950 S.W.2d 811, 814 (Ky. 1997). In those claims, a plaintiff like Sanders must establish causation. *Huffman v. Ss. Mary & Elizabeth Hospital*, 475 S.W.2d 631, 633 (Ky. 1972). He must do so "under the substantial factor test," which requires him to "prove that [the] defendant's conduct was a substantial factor in bringing about a plaintiff's harm." *Red Hed Oil, Inc. v. H.T. Hackney Co.*, 292 F. Supp. 3d 764, 773 (E.D. Ky. 2017). That means that the "*defendant's* product" must have caused the plaintiff's injury. *Id.* (quoting *Smith v. Wyeth, Inc.*, 657 F.3d 420, 423 (6th Cir. 2011) (emphasis in *Smith*). The upshot: if the plaintiff doesn't establish that the defective product was made or sold by the defendant, the plaintiff can't establish causation—or, consequently, liability.

Consistent and compelling evidence supports DSG's position that it didn't make or sell the defective strap. Sanders alleges the tan strap came from a system made by Primal Vantage, whose climbing-stick systems DSG undisputedly sold under its Field & Stream label.[4] DSG Summary-Judgment Motion at 3. But in a sworn statement, Primal Vantage's president, Alyssa Debiak, states that the company "has never supplied a one-inch tan colored buckle strap" with any of its products. Debiak Affidavit ¶ 8. Primal Vantage straps differed from the broken strap's design in other ways as well. The broken strap, all agree, is tan with a single row of beige stitching. The strap Primal Vantage packaged in systems sold through DSG, according to Debiak's testimony, is black with black box stitching. *See* Strap Photos (DN 36-4, Exhibits C-B–C-G); Debiak Affidavit ¶¶ 10–12. The Primal Vantage cam-buckle thumb release differed from that of the tan strap; so did the buckles' spring-loaded thumb-depress buttons; and the Primal Vantage and tan-strap buckles were different sizes. Debiak Affidavit ¶¶ 13–15. The verified Primal Vantage strap and the tan strap Sanders ascribes to DSG differ in color and these additional significant ways— none of which Sanders can explain.

Photos of the accident scene (taken by Sanders when he returned to it several months later) show straps of three different colors. Donald W. Sanders, Jr. Deposition (DN 36-6) at 83:3–84:15. But his own photographs contradict his account that he pulled a complete new set from the box. *Compare id.* at 86:19–24, *with id.* at 45:15–25. The straps in the photos were recovered from the accident scene, preserved by the parties, and examined by George Saunders, an expert for DSG. Saunders has conducted regular engineering investigations of hunting-related products for 20 years. Saunders Report ¶ 4. After his examination of the physical evidence, he concluded that Sanders was using a hodgepodge of straps in his installation—not anything that would have been packaged as a single set. ¶ 11. The five straps obtained during discovery from Sanders' installation included one camo strap, one

---

[4] The parties confirmed at the summary-judgment hearing that Primal Vantage has never been a party to this suit.

black with black stitching, one black with orange stitching, and two tan straps (including the one that broke).  ¶ 15.  Saunders confirms that only one of the five straps was a Primal Vantage product—the black one with black stitching.  ¶¶ 15, 17.  Neither DSG nor Primal Vantage made any of the other products, according to Saunders.  The camo strap was made by Direct Outdoor Products.  ¶ 15.  The black strap with orange stitching "was a user created assembly that was an amalgamation of parts from unknown but different sources."  *Id.*  And the tan straps, though their provenance is unknown, "were not the original straps which came packaged with the [Primal Vantage] product and were not an equivalent or substitute."  *Id.*

Saunders' conclusion that the tan straps weren't packaged with the system relies on his observation that the physical evidence contains a strap matching the illustrations in the system's written instructions.  ¶ 17.  The instruction manual packaged with the Primal Vantage system depicts a strap and buckle with an identifiable design.  *Id.*  A strap with those design features was found at the site of the accident.  The presence of three unique straps at the accident site, including one that Sanders would have obtained from an authentic Primal Vantage system "rende[r] the possibility that the beige straps that separated were mis-packaged and/or provided with original distribution of the climbing stick infeasible and illogical."  ¶ 18.  Saunders notes, too, that Primal Vantage "does not sell beige straps and has no prior record of mis-packaging the wrong straps with their climbing straps."  *Id.*  So the chances that the accident was caused by a tan strap mysteriously pulled from a Primal Vantage box—rather than a tan strap from a different manufacturer *substituted* for a Primal Vantage strap—grow remoter still.

Overwhelming evidence, therefore, indicates that Sanders' strap was not part of any Primal Vantage system.  That conclusion is supported by expert testimony, the manufacturer's testimony, and a common-sense visual inspection of the mix-and-match set of straps from the accident, as produced in discovery.

DSG's considerable proof, appropriately identified under FED. R. CIV. P. 56, shifts the burden to Sanders to point to admissible evidence creating a genuine issue of material fact.  If Sanders can't establish that DSG made or sold the faulty strap, he can't establish causation.  And if he can't point to evidence in the record that would allow a jury reasonably to reach that conclusion, then he can't survive summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient").

**B.  Sanders has failed to identify admissible evidence creating a genuine issue of material fact about causation.**

To rebut this showing, Sanders points to only two pieces of evidence.  One is his own uncorroborated declaration—much of which rests on inadmissible hearsay.

The other is an inadmissible screenshot of a photo on a website. Neither suffices to send the causation question to a jury.

### 1. Sanders' deposition

During his deposition, Sanders said that he bought a Primal Vantage climbing-system box from DSG, opened the box to find tan straps inside, and assembled the complete set. Sanders Deposition at 73:10–75:9, 77:14–80:2. Later, DSG's lawyer showed Sanders photos of the installation he fell from—photos Sanders himself took. *Id.* at 83:13–84:4. They showed the hodgepodge of straps attached to the tree where Sanders fell, not the complete tan set he earlier had described using. *Id.* at 84:5–11. Neither the photographic nor the physical evidence from the scene, in other words, matched Sanders' recollected testimony.[6]

Given a chance to explain the apparent contradiction, he said that his hunting buddies, Rick Suiter and Andrew Chapman, "went back and looked at every strap and … started replacing [the tan straps] because they were—they didn't feel right. They felt like the one that broke on me. So they ended up replacing them." *Id.* at 85:11–15. Where did those tan straps end up? Sanders says his friends "trashed them … because they were—they didn't feel right. Just like the one that had broken." *Id.* at 86:10–14. When Suiter and Chapman returned to the scene, according to Sanders, the friends replaced some of the original tan straps with the black straps later taken into evidence. *Id.* at 104:14–107:17. They apparently worried that a trespasser might show up and try to use them. *Id.* at 104:21–23, 108:1–3. But Sanders himself didn't return to the scene until months later, when a variety of straps were collected from the tree. So his knowledge of what came before depends on his memory of statements by his friends—in other words, hearsay. *See id.* at 83:17–19, 106:5–10; FED. R. EVID. 801(c)(2). And "hearsay evidence may not be considered on a motion for summary judgment." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).

Suiter and Chapman, for their part, offer *admissible* testimony that *contradicts* Sanders' strap-swapping story. Suiter agreed under oath that the amalgamation of straps photographed on the tree looked like the straps on the tree when Sanders fell (two black straps and two tan straps). Suiter Deposition (DN 42-1) at 50:9–52:24. Both Suiter and Chapman testified that one of them added the camo strap shortly after the fall to replace the tan strap that had broken, *id.* at 49:12–50, but never changed any other straps, *id.* at 52:25–56:16; Andrew Chapman Deposition (DN 42-2) at 15:23–19:14. That contradicts Sanders' deposition testimony that he was originally using the full, original Primal Vantage system with five tan straps.

---

[6] The photographs weren't cited by either side in their summary-judgment briefing, but both sides agree that it showed a system using the straps of different colors and origin that were taken into physical evidence.

So where does the summary-judgment record stand?  DSG points to a sworn statement from the president of Primal Vantage that the company never sold tan straps, testimony from an expert in hunting gear who confirmed the broken strap in question was not a Primal Vantage strap, and agreement that photos show a system featuring multiple colors and styles of straps (including some black straps the expert attributes to the Primal Vantage system used).

Against all this, Sanders can point to a single piece of evidence: his own testimony that he used tan Primal Vantage straps on the day of the fall.  And much of his account is contradicted by his friends' sworn accounts and the photographic proof that neither side challenges.

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  "Although the non-moving party is entitled to all reasonable inferences when evaluating a summary judgment motion, when a plaintiff's claims are only supported by his own contradictory and incomplete testimony … no reasonable person would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." *Reich v. City of Elizabethtown, Kentucky*, 945 F.3d 968, 981 (6th Cir. 2019) (quoting *Bush v. Compass Group USA, Inc.*, 683 F. App'x 440, 449 (6th Cir. 2017)).

Given that the photographic evidence, eyewitness statements, and expert testimony support DSG's assertion that Sanders wasn't using an all-tan set of straps, and given sworn testimony that Primal Vantage never sold such straps with its products, Sanders' own statements to the contrary do nothing more than introduce "metaphysical doubt" as to the origin of the broken strap.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  No other documentation or testimony substantiates Sanders' story.  And overwhelming evidence undermines it.  The manufacturer swears its system never included tan straps.  An expert in hunting products swears that the tan strap in question didn't come from the Primal Vantage system.  Suiter agrees that the mishmash of straps in evidence are the straps that were on the tree when Sanders fell, and Suiter and Chapman both swear they neither removed tan straps nor replaced them with black straps after the fall.

Without corroboration from Sanders' hunting friends, and without personal knowledge of how the tan straps were replaced with black ones, Sanders' assertions require the Court (and would require a jury) to credit quite a story about those allegedly defective tan straps sold by DSG.  First, Primal Vintage made and DSG sold at least one climbing system that featured tan rather than black straps, even though every other piece of admissible evidence indicates the contrary.  Second, Sanders unpacked a new DSG climbing system with a complete set of tan (not the typical

black) straps before installing it on the tree where he fell.  Third, after his fall—but before any photos were taken—his buddies decided to replace some but not all of the tan DSG straps with an assortment of other straps.  Fourth, the original tan straps disappeared without any trace or any recollection of his friends.  And fifth, the straps photographed on the tree and taken into evidence are not the ones Sanders used.

Sanders' only explanation for this unfortunate series of events, moreover, involves steps taken and seen only by his friends.  But those friends either don't remember or outright deny the actions Sanders ascribes to them (replacing straps after the fall and trashing the tan originals).  When a plaintiff's testimony is "largely unsubstantiated by any other direct evidence" and "'so replete with inconsistencies and improbabilities' that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in [the] complaint," courts have granted summary judgment, determining that "no reasonable jury could have credited [the] testimony." *See Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005) (quoting *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 475 (S.D.N.Y. 2003)).

To be sure, the summary-judgment analysis cannot and does not assess the credibility of Sanders' deposition testimony.  *See Render v. FCA US, LLC*, 53 F.4th 905, 914 (6th Cir. 2022).  Rather, it acknowledges his testimony that he unboxed a tan strap system made by Primal Vantage that he says he obtained from DSG—his sole admissible evidence of causation—and considers it alongside the contrary causation evidence offered by DSG.  That includes the Primal Vantage CEO testimony that the company never made tan straps, the expert analysis that the broken strap couldn't have come from Primal Vantage, the presence of a *black* Primal Vantage strap on the tree he fell from, the undisputed accounts of a photographed system including straps of various colors and origins, the Suiter and Coleman testimony undermining Sanders' account of how the substituted straps found their way to the tree, and Sanders' possession of numerous climbing-strap systems from suppliers other than Primal Vantage.  Considering the overwhelming imbalance of evidence in the summary-judgment record, the court concludes that a reasonable jury could not find that Primal Vantage (and therefore DSG) supplied the tan strap that broke.  *See Anderson*, 477 U.S. at 252 (courts grant summary judgment when the evidence "is so one-sided that one party must prevail as a matter of law").  Sanders' testimony alone, even if credited by a jury, would not be enough to overcome DSG's evidence and create a genuine issue of material fact.  *See, e.g.*, *Reich*, 945 F.3d at 980 ("plaintiff's own contradictory and incomplete testimony" fell short of creating a genuine issue of material fact for the jury) (quoting *Jeffreys*, 426 F.3d at 555).

7

**2.  A website screenshot of a climbing system for sale doesn't create a genuine issue of material fact.**

Sanders does provide one other piece of evidence in support of his account: a screenshot of a photo of a Field & Stream box posted online in a secondhand sale. Rust Expert Report (DN 40-1, Exhibit 3) at 2.



**Figure 1.**

Sanders, however, cannot explain how he would admit this image into evidence.  And even if he did, it's insufficient to create a genuine dispute over causation.

Sanders' lawyer—but no actual fact witness—asserts that the photo was captured from a secondhand retail site (hence the messy garage scene framing the box).  *Id.* at 3.  The box that apparently contained a climbing stick, as shown in the screenshot, is partially covered by a Field & Stream label with an illustration of a climbing system that, according to plaintiff's counsel, "appears to be equipped with tan straps."  Response at 5.  These appear to have the same coloring as parts of the tree depicted, though their true color is difficult to discern and the illustration appears like it may be printed in grayscale, not color.

This photo only appears in the record as part of an expert report from Dr. Jon P. Rust, a textile engineer. Rust Report at 2. His report, which otherwise addresses the tan strap's mechanical suitability for a climbing system, includes the screenshot. *Id.* at 5. Rust didn't find or capture it, but instead heard about it from Sanders' lawyer (who did). The image apparently came from Mercari—a web platform for buying and selling secondhand goods, *How it Works*, MERCARI, https://www.mercari.com/us/help_center/topics/account/guides/how-it-works/ (last visited Mar. 26, 2025). The box appears to contain a different product than the one that was used; it describes a 16-foot climbing stick instead of the 20-foot version sold by Primal Vantage. Nothing indicates when or where the box was purchased, what it contained, whether or how that Field & Stream label was connected with Primal Vantage, or whether the straps portrayed on the label match those Sanders allegedly used. Yet Rust's report states that he viewed the same photo on the Mercari site and opines that it "show[s] non-black straps similar in appearance to the failed strap." Rust Expert Report at 3–4. Nothing in the report (or any other record evidence identified by Sanders) connects this opinion to Rust's training, experience, education, or other expertise in textile engineering.

Rust lacks any expertise that would allow him to opine on the color of straps visible in a screengrab. "A witness, lay or expert, may not form conclusions for a jury that they are competent to reach on their own." *United States v. Freeman*, 730 F.3d 590, 597 (6th Cir. 2013) ("[The witness's] proffered testimony ... consisted of opinions which were not helpful to the jury because they addressed matters that were equally within the competence of the jurors to understand and decide, and thus were inadmissible under Fed. R. Evid. 701 and 702.") (quoting *McGowan v. Cooper Industries, Inc.*, 863 F.2d 1266, 1272–73 (6th Cir. 1988)). A jury would be just as qualified as Dr. Rust to determine whether the depiction on the box shows tan (or at least non-black) straps. Thus, the screenshot can't be smuggled into evidence as part of Dr. Rust's report or testimony; nor can his (questionable) conclusion that Field & Stream once sold a climbing system with non-black straps.[7]

---

[7] Rust offers only one other opinion of potential value: that the broken tan strap was unsafe for use in a stick-climbing system. Rust Expert Report at 6. No one disputes that: DSG's expert agreed that the tan strap was not "suitable" for a stick-climbing system. Saunders Report ¶ 15. With one inadmissible opinion and one redundant one, Rust's testimony has no bearing on the case. The Court therefore would grant DSG's motion to exclude Rust's testimony. DN 35. To the extent his opinions weren't irrelevant and moot, the Court would still grant the motion to exclude based on the untimely nature of his disclosure. Sanders filed Rust's expert report more than three months past the deadline for expert reports and several weeks after the May 1 deadline for discovery depositions of experts. *See* DN 31; DN 35-4 at 7. The Federal Rules of Civil Procedure require courts to exclude late evidence "unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). Sanders' only justification is a delayed shipment to Dr. Rust due to "severe

"[T]he proponent of a proffered photograph has established a prima facie case for its admissibility when he has shown it to be an accurate representation of" what it purports to represent. *United States v. Hobbs*, 403 F.2d 977, 978 (6th Cir. 1968). But when pressed, Sanders' lawyer struggled to identify how she would admit the screenshot into evidence.

First, she suggested that the judge take judicial notice of the Internet search and conclude that a Field & Stream tree-climbing system with tan straps does in fact exist. S*ee* Fed. R. Evid. 201(b)(2). "[C]ourts do not take judicial notice of documents," however; "they take judicial notice of facts." *Abu-Joudeh v. Schneider*, 954 F.3d 842, 848 (6th Cir. 2020). And ordinarily those are facts of an official or obvious nature. *See, e.g.*, *Antony v. Buena Vista Books, Inc.*, No. 18-cv-205, 2024 WL 218111, at *3 (E.D. Ky. Jan. 19, 2024) (taking judicial notice of "plots, characters, and themes of well-known books, films, and television shows"). Even assuming Sanders is right that this second-hand item is in fact being offered by an online reseller, that hardly establishes—to the level of confidence required for a judicially noticed fact—that DSG did indeed sell a Field & Stream/Primal Vantage tree-climbing system with tan straps. Whether to take judicial notice of a fact rests within the sound discretion of a trial court, *see Jones v. Prudential Security, Inc.*, 534 F. Supp. 3d 839, 841 (E.D. Mich. 2021), yet taking notice of a "fact" such as that proffered by Sanders would abuse even that extensive discretion.

Second, Sanders' counsel proposed that she could let her colleague try the case so she could step down and become a witness as to her efforts to find the photo online. Fact testimony from lawyers in their own cases is of course disfavored, even with respect to ordinary facts in their direct knowledge. *See* Kentucky Rules of Professional Conduct, SCR 3.130(3.7)(a). And this concerns a highly unusual fact about a product never seen, used, or studied by the lawyer other than by viewing a website. She cannot establish that the photograph is "an accurate representation" of the box itself, much less that DSG did in fact sell the product or that the box does in fact contain tan straps of the sort Primal Vantage swears it never made.[8]  No one

---

winter storms." Response to Motion to Exclude (DN 39) at 8. But as Sanders acknowledged at the summary-judgment hearing, the package arrived weeks later, not three-and-a-half months later (when the report was finally disclosed). A brief postal snag wouldn't excuse the significant lateness of the filing. Nor was the delay harmless, given that it arrived *after* the expert-deposition deadline weeks before.

[8] DSG might still contend that even this confirmation would fall short. After all, the depiction on the box may or may not accurately represent the product inside, which is the real issue in this case. But for Sanders' purposes—creating a genuine dispute about whether DSG ever sold systems with tan straps—a box depicting a tan-strapped system could be enough.

even knows, for example, the lighting or shading of the photograph of the label. Whom could DSG cross-examine on these important questions?

Even if the screenshot were admissible, it still would not create a genuine dispute about causation. A "genuine" dispute exists only if there is evidence upon which a reasonable jury could find for the nonmovant. *Niemi v. NHK Spring Co.*, 543 F.3d 294, 298 (6th Cir. 2008). Here, the screenshot surely wouldn't offer Sanders more than a "scintilla of evidence." *Anderson*, 477 U.S. at 252. For the image to be useful at all, Sanders would need a jury to make a color determination from a screenshot of a photo of an (apparently) faded or grayscale-printed label that may or may not be related to the product Sanders was using when he fell. And it would have to do so without any information or testimony regarding the origin of the image, its contents, or its relationship to the supplier. That hardly corroborates Sanders' story of stealthily substituted straps or undermines Primal Vantage's explanation regarding its products. A reasonable jury would not credit that story based on this screenshot and Sanders' say-so alone. The inadmissible screenshot—even if it were admitted—wouldn't suffice to spare Sanders from summary judgment.

## ORDER

Because Sanders lacks evidence to create a genuine issue of material fact about whether a product made or sold by DSG caused his injury, and because his wife's loss of consortium claim depended entirely on the success of his products-liability claims, the Court grants DSG's motion for summary judgment (DN 36). The Court also grants DSG's motion to strike Dr. Rust as an expert (DN 35) for the reasons described above. A separate final judgment will follow. *See* FED. R. CIV. P. 58.

Benjamin Beaton, District Judge

United States District Court

March 31, 2025